Filed 5/1/20 (review denied 8/31/20; reposted to include Supreme Court statements upon denial of review)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B298914 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA461402) |
| v. | |
| YOSAYA JOHNSON TRIPLETT, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge. Affirmed as modified.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion *post*, parts A., B., and D.

Assistant Attorney General, Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Yosaya Johnson Triplett of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] carjacking (§ 215, subd. (a)), and attempted murder (§§ 211, subd. (a), 664). The jury also found true allegations that defendant personally inflicted great bodily injury in the commission of the assault and attempted murder. (§ 12022.7, subd. (a).) The court sentenced defendant to a prison term of 11 years 8 months.

During jury deliberations, the court denied the jury's request for transcripts of testimony of certain witnesses and defense counsel's request to inform the jurors that they could have the testimony read back to them. In the published portion of this opinion, we hold that the court erred by denying defense counsel's request. We further hold that, under the circumstances in this case, the error was harmless.

In the unpublished portion of this opinion, we reject defendant's contentions that the trial court erred in denying his *Wheeler*/*Batson*[2] motion during jury selection and that the evidence was insufficient to support the attempted murder conviction. We also agree with defendant that a clerical error in a sentencing minute order must be corrected, and agree with the People that the defendant's sentence must be corrected to include certain assessments.

We affirm the judgment as modified to correct the sentence.

_____

[1] Subsequent statutory references are to the Penal Code.

[2] *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

## FACTUAL AND PROCEDURAL SUMMARY

### A.  *Prosecution Evidence*

In September 2017, defendant was living with her boyfriend, Donnie Faizon, at the home of Faizon's uncle, Russell Allen.  On the evening of September 8, 2017, while defendant was working at a nightclub, Dalilah Young visited with Allen and Faizon at Allen's home.

Young testified that she left Allen's home at 11:30 p.m. and crossed the street to her car.  A truck or sports utility vehicle pulled up close to her car.  As Young got into her car and put her key into the ignition, defendant got out of the other vehicle, walked to Young's car, and pulled the car door open.  When Young stepped out of the car, defendant stabbed Young in the head with a knife with a two-inch blade.

Young "fought back" in "[s]elf-defense."  During the fight, defendant stabbed Young repeatedly, inflicting wounds in Young's temple, cheek, wrist, neck, and the side of her torso.  Defendant grabbed Young's phone from her car and threw it into the street.  Defendant then began to choke Young, and told her, "Look at you bitch.  Fittin' to die bleeding and shit."

Defendant got in the driver's seat of Young's car and drove forward and backward, hitting parked cars.  When Young grabbed the driver's car door, defendant drove forward, causing Young to hit the ground.  Defendant then drove away in Young's car.

Young returned to Allen's residence and Allen called 911.

Young was hospitalized for a week as a result of the injuries she suffered in the assault.  Lacerations from the eight stab wounds varied in length from one-third of an inch to three

inches.  One cut pierced Young's lung and could have been fatal if untreated.  The other lacerations were superficial.

Young's car was located five months later in a parking lot, vandalized and damaged.

### B.  *Defense Evidence*

Defendant testified that on the night of the incident her grandfather picked her up from the nightclub where she worked.  As they pulled up to Allen's home, Young opened the car door, pulled defendant out by her hair, and began beating her.  Defendant pulled a knife from her waistband and stabbed Young to defend herself.  Defendant then ran upstairs and told Allen to call an ambulance because she had stabbed "this girl outside."  Defendant waited for the ambulance, then left with her grandfather, who took her to her mother's home and then to a motel.

Defendant explained that she keeps the knife with her because she carries large amounts of cash when she comes home from her work at a nightclub and she lives in a "rough" area.  She denied that she threw Young's phone or took her car.

# DISCUSSION

## A. *Denial of Defendant's Wheeler/Batson Motion*

Defendant contends that the trial court erred in denying her *Wheeler/Batson* motion with respect to the prosecutor's peremptory challenges of two prospective female African-American jurors. We disagree.

The following additional facts are relevant to this inquiry.

Defendant is an African-American woman who was 20 years old at the time of trial. Young is African-American and was 21 years old at the time of trial. The jury venire consisted of 40 people, three of whom were African-American. Each African-American was female. The trial court excused one of the three for cause before jury selection began. The remaining African-American jurors were designated Juror No. 7 and Juror No. 16.

During voir dire, the prosecutor asked the prospective jurors: "Just by looking at [the defendant] here, is there anyone else who thinks they might not be a fair juror because they can't imagine her committing an assault with a deadly weapon, carjacking? Is there anyone who looks at her and can't imagine she would have done that and can't be fair to the prosecution?"

Juror No. 7 responded: "You are saying for me to agree that she didn't do it by looking at her? I don't think she would put her life—I don't think she did it."

The prosecutor then asked Juror No. 7: "[I]f I call witnesses and I prove my case beyond a reasonable doubt, would you be able to convict, or would this idea just by looking at her that you can't imagine her doing these things, would that prevent you from convicting?" Juror No. 7 responded: "I haven't heard anything. I can't answer that."

5

Juror No. 16 informed the court during voir dire that she had brothers who had been charged with crimes similar to those charged against defendant. She also had a cousin who had been murdered five or six years earlier, and the police investigation is "still going on."

In response to the question, "do you know anybody who has been treated badly by the police or the courts," Juror No. 16 answered: "Yes. Just growing up in L.A." When asked about this comment, she explained: "A black woman in L.A. with young black brothers, I have been harassed many times" by officers.

Juror No. 16 said there was nothing about these experiences that would impact her ability to evaluate police testimony or to be fair in this case.

The prosecutor used two of his first four peremptory challenges to dismiss Juror No. 7 and Juror No. 16. Defense counsel then made a *Wheeler/Batson* motion.

The trial court found that the defense had established a prima facie case of impermissible group bias and prompted the prosecutor to state his reasons for excusing the jurors.

The prosecutor stated the following regarding Juror No. 7: The juror "indicated she grew up in Los Angeles in the Inglewood area and lived there her entire life. She was single, worked retail, had not been a member of a jury, and had not been a victim of a crime. [¶] Upon more questioning, she expressed she lived in Inglewood her entire life—which is similar and close to the area of where this crime occurred in South Los Angeles. [¶] She appeared to me to be a little young. I asked questions about what her life experience would be. She works at the Los Angeles airport working retail. When I asked her what retail, she said normal convenience items. It is a place she would run into

6

people.  Not in a managerial position or a judgment position. [¶]  She seemed to be inexperienced to me.  She did not attend any college or advanced education after high school.  I don't know if the court noticed, yesterday afternoon she was chewing gum during the duration of the jury instruction.  That, to me, indicated some immaturity and disrespect for the court proceedings.  [¶]  She also . . . said that it was difficult to believe the defendant had committed this crime, assault with a deadly weapon and attempted murder, just based on her looks and her sitting here.  [¶]  I understand the court denied the People's motion to strike that juror for cause, but I think her feelings about the defendant being here and being charged with the crime might make her unfair to the People."

Regarding Juror No. 16, the prosecutor stated the following:  "Juror number 16 indicated she lived in Leimert Park. I believe she grew up in West L.A., married with no kids, a registered nurse working in the emergency room.  She does have a managerial position and has been a charge nurse before.  She has not been a victim of a crime and has never served on a jury. [¶]  She said she had some relatives that were officers.  She grabbed my attention when she said some of her brothers had been charged with similar crimes.  That alone made me think I may not want her on the jury.  [¶]  I tend to like jurors who have not been a member of a jury at all.  When my witnesses testify, I want them to see testimony for the first time ever.  [¶]  She said she had not talked to her brothers about the court cases or how they turned out.  I think she indicated to us the reason—or she could be fair because she had no idea whether they were treated fairly or not.  [¶]  To me, simply the fact that her brothers have been charged with assault with a deadly weapon and attempted

7

murder is one factor in the back of her mind when she listens to how our officers have investigated this case and whether or not the defendant is guilty in our case."

The prosecutor further stated: "What really concerned the People was her answer to the court's question to number 16. There are many people who have grown up in L.A. and may feel like they could be fair, could not be fair, based on their experience. Perhaps I haven't practiced here long enough. I never heard a juror say as a response[,] 'I can't be fair just growing up in L.A.' [¶] I understand what she means. When I asked her, she clarified saying she is a black female. She has been harassed. It sounds like she has seen both the good and bad of society in general. In addition, her cousin was murdered. Apparently, that investigation is still ongoing. [¶] She may be a fair juror. I am not convinced of that mostly because of her answer, 'just growing up in L.A.,' she might not be fair. Her brothers were charged with similar crimes. That is the bulk of the reason. [¶] In addition to that, although it is a smaller reason, great bodily injury is an issue in our case. I know we do have other nurses. Those nurses do not work in the emergency room. This juror is in a position to see injuries that are more like what we are going to see in our case relative to the other nurse who works in the ICU or a nurse who works in surgery, which is less of an emergency situation."

The court then denied the defense *Wheeler/Batson* motion, stating: "As to Juror [No.] 7, the one issue that stands out to me, Juror [No.] 7 indicated she didn't think the defendant looked like a person who could be guilty in this case. In my judgment, that is a very valid race neutral position. [¶] As to [Juror No.] 16, as the People pointed out, just living in Los Angeles, she would

8

have bias against police officer testimony. She also indicated she had brothers charged with a similar crime and a cousin who was murdered. In my view, those are also very valid race neutral reasons. [¶] For those reasons, the People have established race neutral reasons for the exclusion of both jurors, [Juror No.] 7 and Juror [No.] 16."

Under *Wheeler*, *supra*, 22 Cal.3d 258 and *Batson*, *supra*, 476 U.S. 79, the use of peremptory challenges to remove prospective jurors solely on the basis of a group bias, such as race or ethnicity, violates our state and federal constitutions. (*People v. Rhoades* (2019) 8 Cal.5th 393, 423.) In evaluating a *Wheeler/Batson* motion, the trial court engages in a three-step inquiry: First, the objecting party must make a prima facie showing of prohibited group bias; second, the burden shifts to the party who exercised the peremptory challenge to give a nondiscriminatory reason; and third, the trial court evaluates the proffered reasons and determines whether the objecting party has proven purposeful discrimination. (*People v. Silva* (2001) 25 Cal.4th 345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.) "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the [peremptory challenge]." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 (*Lenix*).)

Here, the court found that defendant made a prima facie showing of discrimination and defendant does not dispute that the prosecutor proffered nondiscriminatory reasons for excusing Jurors No. 7 and No. 16. Defendant's challenge is to the court's third-step determination that the prosecutor's reasons for dismissing the two African-American women were race neutral.

At the third step, " 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire." (*Lenix, supra,* 44 Cal.4th at p. 613, fn. omitted.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Lenix, supra,* 44 Cal.4th at pp. 613–614.)

The court's conclusion that the prosecutor provided a race-neutral reason for excluding Juror No. 7 is supported by the record. The prosecutor stated, among other reasons, that he excused Juror No. 7 because the juror indicated it was difficult for her "to believe the defendant had committed this crime, assault with a deadly weapon and attempted murder, just based on her looks and her sitting here." The reason is patently race neutral and the court's determination of its validity is supported

by the prosecutor's question to the prospective jury panel—"[i]s there anyone who looks at [the defendant] and can't imagine she would have done that"—and Juror No. 7's response: "I don't think she did it." It is certainly permissible for a prosecutor to excuse a juror who does not think the defendant "did it" based on the mere appearance of the defendant.

Defendant contends that the particular reason the court found credible should have been rejected because it was part of a "laundry list" of reasons the prosecutor offered. As our Supreme Court has explained, a prosecutor who employs the " 'laundry list' approach" at the second step of a *Wheeler*/*Batson* motion by "positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158.) Trial courts should therefore "attempt to evaluate the attorney's statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered." (*Id.* at p. 1158.) The court is not, however, required "to make detailed comments on every [stated] reason." (*Ibid.*) "This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

Here, in addition to Juror No. 7's statement that she did not "think [the defendant] did it," the prosecutor pointed to facts disclosed during voir dire that the juror lived near the location of the crime, was young and lacked life experience, and displayed immaturity and disrespect to the court by chewing gum during voir dire. Defendant has not explained how any of these

11

additional reasons are implausible or factually unsupported, and the absence of express findings by the court on each reason does not require reversal.

Regarding Juror No. 16, the court, apparently based on its own observations during voir dire, agreed with the prosecutor that the juror indicated a bias against police officer testimony "just living in Los Angeles." The court also commented on the fact that the juror has two brothers charged with similar crimes. Both of these reasons, the court concluded, are "very valid race neutral reasons." The reasons are race neutral and supported by the record. Juror No. 16 stated that she had "brothers" who had been charged with crimes similar to the charged crimes in this case. She further stated that she knows people who have been treated badly by the police or courts, and that she has been harassed many times as a Black woman with two young Black brothers. The prosecutor can reasonably infer that a juror with such experiences may be biased against police officers who testify for the prosecution.

Defendant points out that Juror No. 16 said she has a cousin and a brother who work in law enforcement and could be fair despite her and her brothers' experiences with police officers. As our Supreme Court has explained, however, "[t]he fact that the *objector* thinks his opponent should feel comfortable with the candidate is not the relevant question. The question is whether the advocate *exercising the challenge* had an honest and racially neutral reason for doing so." (*People v. Hensley* (2014) 59 Cal.4th 788, 803.) The trial court found that the prosecutor had such a reason, and the reason is supported by the record.

12

Defendant also asserts that another person who was ultimately selected to be on the jury and was not African-American, was a nurse, as was Juror No. 16, and whose father had been charged with assault on a police officer. The father's crime and trial took place before the juror was born, and he had never been told "any bad stories" of the government or the police. Significantly, the other juror did not report that he or she had been harassed or had known anyone who had been treated badly by police. Because the two jurors are materially dissimilar, we reject the defendant's argument.

For the foregoing reasons, defendant has failed to show that the trial court erred in denying her *Wheeler*/*Batson* motion.

## B.     *Sufficiency of the Evidence of Attempted Murder*

Defendant contends that the evidence is insufficient to support the jury's verdict of attempted murder. More particularly, defendant argues that there is no substantial evidence that defendant acted with the intent to kill Young. We disagree.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sánchez* (2016) 63 Cal.4th 411, 457.)

When a defendant challenges the sufficiency of the evidence to support a judgment, "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is

13

reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.) "[S]ubstantial evidence encompasses circumstantial evidence and any reasonable inferences to be drawn from such evidence." (*People v. Lopez* (2013) 56 Cal.4th 1028, 1070.)

A jury could reasonably conclude from the evidence that defendant intended to kill Young. Although defendant's knife was relatively small, the location of the stabs—to the head, neck, and torso—were vulnerable areas; even a knife with a two-inch blade could have caused Young's death. In addition to the multiple stabbings in vulnerable areas, defendant told Young as she choked her that Young was "[f]ittin' to die bleeding," then left her alone in the street as she fled. Rational jurors could conclude that these acts, viewed in their entirety, established defendant's intent to kill beyond a reasonable doubt.

Defendant contends that the evidence is insufficient to support the jury's finding of intent to kill because the evidence "established the knife and the frenzied stabbings were a completely unplanned reaction to the highly-emotional situation created when appellant saw [Young] leaving the home of [defendant's] boyfriend Faizon." The fact that defendant carried a knife into the fight, she argues, does not justify a finding of intent to kill because she was armed "for defensive purposes." The incident, she concludes, was merely "a physical altercation between two young women and once the first punch was thrown it escalated to the point where [defendant] found it necessary to jab at [Young] with a small knife." The argument is based on a view of the evidence favorable to the defense, contrary to our standard of review. When, as here, " 'the circumstances

14

reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.)

Defendant further asserts that "it was significant that during deliberations the jury asked the trial court for a clearer definition of 'intent' in regard to attempted murder." Defendant also refers us to the fact that the jury requested defendant's and Young's testimony as an indication that the jury "struggle[d] over the 'intent' element." Although the jury's question and request may suggest that the jury had difficulty making its finding of intent, our task is limited to determining whether there is substantial evidence to support the finding it ultimately made, and here there was.

### C.    *Jury's Request for Trial Transcripts*

During jury deliberations, the jury asked the court for "transcripts of witnesses:  D[a]lilah Young and Yosaya Johnson Triplett." (Capitalization omitted.)  The court informed counsel that it intended to respond by informing the jury:  "If you have a specific question about witness testimony, ask the question.  The jury will not receive transcripts of testimony."

Defense counsel did not object to the denial of transcripts as such, but asked if "the court [would] let them know they could have readback."  The court stated that doing so would be "verging on [in]vading the jury's province."  The jurors had been instructed under CALCRIM Nos. 202 and 222 that they "are entitled to have readback of testimony," the court noted, and "it would be inviting error to tell them they can ask for

15

readback, as they have been instructed as to that in two prior jury instructions."**3**

After some colloquy among the court and counsel, the court stated: "I am going to make a ruling[.] I am going to give the jury the note that I intended. The jury, in my view, has been instructed they are entitled to readback. If they want readback they can simply ask for it." The court then responded to the jury, stating: "If you a [*sic*] specific question about witness testimony ask the question. The jury will not receive transcripts of testimony." The court submitted this response to the jury at 10:50 a.m. on the second day of deliberations. The jurors asked no further questions of the court and, at 11:37 a.m., the jury informed the court that it had reached a verdict.

On appeal, defendant argues that the court should have either provided the jury with the requested testimony via readback or reminded the jury to consult the instructions given under CALCRIM Nos. 202 and 222—which informed the jurors that they could request a readback of trial testimony.

Both sides point to section 1138 as the statutory authority governing the issue. That section provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on

_____

**3** The court had given the following two instructions relevant to this issue: " 'If there is a disagreement about the testimony at trial, you may ask that the court reporter's record be read to you' "; and " 'The court reporter has made a record of everything that was said during the trial. If you decide that it is necessary, you may ask that the court reporter's [*sic*] be read to you. You must accept the court reporter's record as accurate.' " (See CALCRIM Nos. 202 & 222.)

16

any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."[4]  (§ 1138.)  Our Supreme Court has held that section 1138 requires the trial court to " ' "satisfy requests by the jury for rereading of testimony." ' " (*People v. Cox* (2003) 30 Cal.4th 916, 968 (*Cox*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).)[5]

As the People point out, the jurors did not request a *rereading* of testimony; they asked for the *transcripts* of the testimony.  Defendant interprets the request more broadly— "Yes, the jury used the term 'transcripts' but the record makes clear the jury wanted to consider the testimony again.  It wanted to 'know the words' of the two most important witnesses, [defendant] and the alleged victim."  We agree with defendant.  There is no conceivable purpose for requesting the transcripts other than to review and consider the words the witnesses spoke.  (See *James v. Key System Transit Lines* (1954) 125 Cal.App.2d 278, 283 [only reasonable interpretation of jury's request for transcript during deliberations was that jury sought a

---

[4] Although the statute's text indicates that a "disagreement" among the jurors is a prerequisite to the right provided by the statute, jurors have the right to have testimony read to them even without a showing of disagreement.  (*People v. Butler* (1975) 47 Cal.App.3d 273, 280 (*Butler*).)

[5] Defendant does not contend that the court erred by refusing to provide the requested transcripts of testimony to the jury.  We do not, therefore, express any view on that question.

17

reading of the transcript]; accord, *Smith v. Shankman* (1962) 208 Cal.App.2d 177, 184; *People v. York* (1969) 272 Cal.App.2d 463, 465 (*York*).)

In *Smith v. Shankman, supra,* 208 Cal.App.2d 177, the jury asked a court bailiff during deliberations for the transcript of the defendant's testimony. (*Id.* at p. 181.) The bailiff informed them they could not have it. (*Ibid.*) This was error because the bailiff was not permitted to communicate with the jurors on a matter other than to determine whether they had reached a verdict. (*Id.* at p. 184.) Relevant here is the court's discussion of prejudice. "Although it is true," the court explained, "that the bailiff was technically correct in instructing the jurors that the written transcript itself could not be given to them, it does not follow that his misconduct was of no consequence. 'While the jury's action did not constitute in so many words a request for a reading of some portion of the transcript, such action can reasonably be interpreted only as such a request. . . .' [Citation.] Had the bailiff properly deferred action on the jury's request until the trial judge had returned . . . , the jury could then have been brought into open court . . . and the judge could have inquired whether they desired to have portions of the relevant testimony reread. As a result of the bailiff's failure to follow this procedure, the jury's request for the transcript was denied in such a manner as to indicate that there was no alternative method by which they could review testimony which they obviously considered important." (*Ibid.*) If, however, the court had been informed of the request and "offered to have the relevant testimony reread to the jury, it is entirely possible, as a practical matter, that its verdict might have been affected." (*Id.* at p. 185.) *Smith*'s

reasoning was adopted and applied under similar facts in a criminal case in *York*, *supra*, 272 Cal.App.2d at pages 465–466.

Neither side has referred us to any California decision factually on point. The Supreme Court of Florida, however, addressed the issue under similar circumstances in *Hazuri v. State* (Fla. 2012) 91 So.3d 836 (*Hazuri*). In that case, the jury asked the trial court if " 'they get transcripts from the trial.' " (*Id.* at p. 839.) Defense counsel requested the trial court " 'advise them that they have a right to have the transcript read back.' " (*Ibid.*) The court rejected the request, stating: " 'Certainly portions of the record could be read, however, I do believe that the accurate and correct response is that they must rely on their own collective recollection of the evidence and we will answer the question that way.' " (*Ibid.*) The jury returned a guilty verdict, and the Florida Supreme Court reversed.

The *Hazuri* court held that "when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back." (*Hazuri*, *supra*, 91 So.3d at p. 846.) The court explained that "a jury cannot properly fulfill its constitutionally mandated role [as factfinder] if it cannot recall or is confused about the testimony presented in a case. Thus, in order to assist the jury in completing its fact-finding mission, trial courts should apply a liberal construction to a jury's request for transcripts. In other words, a jury's request for transcripts of testimony should prompt a judge to inform the jury of the potential availability of a read-back of testimony." (*Id.* at p. 845.) "Whether a jury asks for transcripts of witness testimony or rather uses the term 'read-back,' " the court continued, "it is clear that the jury is requesting a review of trial testimony. A jury is composed of

19

laypersons often unfamiliar with legal terms of art, and there should be no magic words required for a read-back request, especially when the intent of the jury's request for transcripts is clear.  Failing to require further instruction concerning a read-back after a jury has requested transcripts leaves the jury without the means to refresh its memory of witness testimony— testimony that could be critical to the outcome of the verdict." (*Ibid.*, fn. omitted.)  We find this reasoning persuasive and hold that the court in this case erred in construing the jury's request narrowly as a request for transcripts—not a request for a readback of testimony—and in failing to inform or remind the jury of their right to a readback of testimony.

This error requires reversal only if prejudice is shown. (*People v. Frye* (1998) 18 Cal.4th 894, 1007 (*Frye*), disapproved on another ground in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *People v. Litteral* (1978) 79 Cal.App.3d 790, 797.)  Although defendant contends that "the error is of federal constitutional dimension," our Supreme Court has held that errors in the readback requirement are errors of state law that do not implicate federal constitutional rights.  (See, e.g., *Cox, supra,* 30 Cal.4th at p. 968; accord, *People v. Lucas* (2014) 60 Cal.4th 153, 301 (*Lucas*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.)  Because the error is a violation of state law, prejudice is determined under the *Watson* standard.  (*People v. Box* (2000) 23 Cal.4th 1153, 1214, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; *People v. Roberts* (1992) 2 Cal.4th 271, 326 (*Roberts*); *People v. Ainsworth* (1988) 45 Cal.3d 984, 1020 (*Ainsworth*).)  Under that standard, we will reverse the judgment only if, after an examination of the entire cause, it is reasonably

probable that defendant would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*).) The defendant has the burden of demonstrating prejudice under this standard. (*Roberts, supra,* 2 Cal.4th at p. 326; *Lucas, supra,* 60 Cal.4th at p. 263.)

Whether the denial of a readback of testimony is prejudicial depends upon the circumstances of the particular case. (*Butler*, *supra*, 47 Cal.App.3d at p. 284.) In evaluating prejudice, courts have considered juror communications regarding the reason for the readback request (see *id*. at pp. 277–279, 284) and the reviewing court's own evaluation of the testimony (see *Frye*, *supra*, 18 Cal.4th at p. 1008, *Ainsworth*, *supra*, 45 Cal.3d at p. 1020).

Here, defendant points out that "the testimony requested was that of the key witnesses in the case"—Young and defendant—and argues that the refusal to read back their testimony "affected the outcome and verdict, and as such, it is reasonably probable that a result more favorable to appellant would have occurred had the requested testimony been reread." The argument, however, is conclusory and asserted without citation to the record or evaluation of the evidence adduced at trial. Even were we to consider the entirety of the testimony of both witnesses, defendant has failed to show that the outcome at trial would have been different given the utter implausibility of defendant's testimony.

Although defendant testified that her multiple stabbings of Young were in self-defense, her explanation is implausible. Defendant's uncorroborated testimony implies that Young was lying in wait for defendant to arrive home and decided to assault defendant, without a weapon, in the presence of defendant's

21

grandfather. After the assault, defendant remained in the area while police and paramedics tended to Young, but she never reported Young's alleged assault of her, preferring, she explained, to wait until the police came to her one or two weeks later. Although she was living at Allen's home with Faizon at the time, she left the scene that night to go, eventually, to a motel. Such behavior is inconsistent with being the victim of an assault and supports Young's version that defendant was the aggressor. Young's testimony, by contrast, provided a coherent and plausible narrative of events that was consistent with the prosecution's theory that defendant attacked Young in a fit of jealous rage upon seeing Young leaving her boyfriend's home.

In short, whatever the jury's disagreement or confusion prompting it to request the transcript, a readback of the testimony would only have made obvious the porous quality of defendant's defense and confirmed Young's testimony that defendant was the aggressor. Stated differently, after reviewing the transcripts as part of our " 'examination of the entire cause' " (*Watson*, *supra*, 46 Cal.2d at p. 836), we are of the opinion that if the testimony had been read to the jury, it is not reasonably probable the result would have been more favorable to the defendant. The error, therefore, was not prejudicial.

Defendant relies on *Butler*, *supra*, 47 Cal.App.3d 273, in which the Court of Appeal held that an erroneous denial of a jury's request to reread the testimony of five witnesses was prejudicial. Significantly, the jury foreman in that case, in making the request for the readback, explained that " '[s]ome of [the testimony] was so faint we couldn't really hear it correctly, clear.' " (*Id.* at p. 278.) The trial court denied the request and directed the jurors to " 'do your very best to arrive at a verdict

based on the information that you have' " (*id.* at p. 279, italics omitted)—a direction the Court of Appeal described as amounting to "jury coercion" (*id.* at p. 283). Under these circumstances, the Court of Appeal held that the error was prejudicial because "the outright refusal of the jury's request committed the jury to the questionable task of reaching its decisions on the basis of incomplete evidence imperfectly heard." (*Id.* at p. 284.)

Here, by contrast, our record does not reveal what prompted the jury's request for transcripts and there is no reason to believe that any juror was unable to hear or understand the testimony during trial. Moreover, in denying the request for transcripts, the court in this case informed the jurors that they could ask any specific question they had about witness testimony. The fact that no question was thereafter posed implies that whatever prompted the request for transcripts was either resolved or ultimately unnecessary to the jury's decision.

Defendant also asserts that the People "cannot establish the error was harmless." As stated above, however, errors in failing to comply with section 1138's readback requirement are errors of state law for which defendant must demonstrate prejudice. (See *Ainsworth*, *supra*, 45 Cal.3d at p. 1020.) Defendant has failed to do so here.

### D. *Correction of Minute Order and Imposition of Assessments*

The jury found not true the enhancement allegation that, in the commission of the carjacking, defendant personally inflicted great bodily injury upon Young within the meaning of section 12022.7. A minute order reflecting the verdicts, however, incorrectly states that the jury found that allegation

23

true.  Defendant requests that we direct the court to correct the clerical error.  The People agree.  We will so direct.

The court imposed a single court facilities assessment of $30, pursuant to Government Code section 70373, subdivision (a)(1), and a single court operations assessment of $40, pursuant to section 1465.8, subdivision (a)(1).  The People contend, and defendant does not dispute, that the court was required to impose these fees for each of the three felonies of which defendant was convicted and that the sentence must be corrected accordingly.  We agree.  (See *People v. Hicks* (2019) 40 Cal.App.5th 320, 324; *People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.)

## DISPOSITION

The court shall issue a minute order correcting nunc pro tunc to April 18, 2019, the minute order issued that date to reflect the jury's not true finding as to the allegation that the defendant personally inflicted great bodily injury upon Young in the commission of the carjacking charged in count 2 of the information.

The judgment is modified such that a $30 court facilities assessment, pursuant to Government Code section 70373, subdivision (a)(1), and a $40 court operations assessment, pursuant to Penal Code section 1465.8, subdivision (a)(1), is imposed as to each of the three counts of which defendant stands convicted. The court shall issue a minute order reflecting this modification, amend the abstract of judgment accordingly, and send a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

As modified, the judgment is affirmed.

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>.


ROTHSCHILD, P. J.

We concur:



BENDIX, J.        WEINGART, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25

Court of Appeal, Second Appellate District, Division One - No. B298914

**S262052**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

YOSAYA JOHNSON TRIPLETT, Defendant and Appellant.

_____

The petition for review is denied.

Liu, Cuéllar and Kruger, JJ., are of the opinion the petition should be granted.

_____
*Chief Justice*

PEOPLE v. TRIPLETT

S262052


Statement by Chief Justice Cantil-Sakauye


This past January, this court created a Jury Selection Work Group to examine and report on issues of discrimination and inclusivity in the selection and composition of juries in California courts. This group, constituted of justices, judges, and attorneys with extensive experience in jury selection, has begun its work and will continue to study and discuss these issues over the months ahead. Their efforts will make an important contribution to the ongoing multibranch assessment of jury selection practices in this state.

Among the subjects before the work group are how *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 operate in practice in California. The work group will consider whether modifications to *Batson*/*Wheeler* — in addition to any that may be adopted before the work group completes its efforts (e.g., Assem. Bill No. 3070 (2019–2020 Reg. Sess.) as amended Aug. 21, 2020) — or other measures are warranted to address impermissible discrimination in jury selection. These issues are important and worthy of close consideration.

The work group was convened for the purpose of obtaining the independent views and judgment of its members. It should be understood that neither the court's denial of review in this case or other cases, nor the views expressed in any separate statement from a denial of review, represent an effort to influence the work group's deliberations by indicating how a

justice or justices would decide any of the issues that may be presented. A denial of review does not necessarily convey how the court would resolve the issues raised in a petition for review. (See Cal. Rules of Court, rule 8.500(b).) Review may be denied, for example, when issues or facts in the record beyond those emphasized by a petitioner may make a case a poor vehicle through which to resolve the issue(s) presented for review.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**GROBAN, J.**

PEOPLE v. TRIPLETT

S262052


Dissenting Statement by Justice Liu


Defendant Yosaya Johnson Triplett, a 20-year-old Black woman, was convicted at trial and sentenced to an 11-year prison term for the attempted murder of a Black woman and related offenses.  The jury venire began in Los Angeles with 40 people, three of whom were Black.  Before voir dire, the court excused one Black juror for cause, and the prosecutor exercised his first peremptory strike on another Black juror.  Soon after, the prosecutor used his fourth strike to dismiss Prospective Juror No. 16, the last remaining Black juror.

Triplett objected to the strike of Prospective Juror No. 16 as racially motivated under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258.  The court found a prima facie case of racial discrimination and asked the prosecutor to explain his reasons.  The prosecutor said he struck Prospective Juror No. 16 "mostly because of her answer, 'just growing up in L.A.,' she might not be fair."

Earlier, the court had asked each juror, "[D]o you know anybody who has been treated badly by the police or the court?"  Prospective Juror No. 16 responded:  "Yes.  Just growing up in L.A."  When asked to elaborate, she explained: "A Black woman in L.A. with young Black brothers, I have been harassed many times" by police.  The court and the prosecutor followed up on Prospective Juror No. 16's answers by asking if she could be a fair juror and impartially consider police testimony in Triplett's case despite her personal experiences.  Prospective Juror No. 16

repeatedly and unequivocally said yes.  Nevertheless, the court accepted the prosecutor's primary reason for striking her, saying, "[A]s the People pointed out, just living in Los Angeles, she would have bias against police officer testimony."  According to the court, her experiences with law enforcement were a "very valid race neutral reason[]."  Her removal left the venire devoid of Black jurors, and Triplett was convicted by a panel with no Black jurors.  The Court of Appeal affirmed.

This case lies in the heartland of the high court's holding in *Batson*:  "Exclusion of [B]lack citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure," and "the State denies a [B]lack defendant equal protection of the laws when it puts h[er] on trial before a jury from which members of h[er] race have been purposefully excluded." (*Batson*, *supra*, 476 U.S. at p. 85.) The conclusion reached by the lower courts here — that Prospective Juror No. 16's experience being "harassed many times" by police as "[a] *Black woman* in L.A." constitutes a "very valid *race neutral* reason[]" for her removal (italics added) — is quite troubling.  I acknowledge that our precedent may support this ruling.  But as this case illustrates, *Batson*'s guarantee rings hollow when it is understood to allow prosecutors to strike Black jurors for reasons that systematically function as proxies for the jurors' race.

Although this issue is on the radar of the Legislature and our recently appointed jury selection work group, it remains an important doctrinal issue that this court should revisit.  It is not clear that pending legislation to address this issue would affect cases already tried.  (Assem. Bill No. 3070 (2019–2020 Reg. Sess.) § 2, subd. (i), as amended Aug. 21, 2020 ["This section applies in all jury trials in which jury selection begins on or after

January 1, 2022."].) And given our usual timeline for disposition of granted cases, our review of this matter would in all likelihood derive the benefit of the jury selection work group's efforts. In light of mounting concerns about the efficacy of *Batson* and distrust of law enforcement and the justice system arising from the experiences of Black Americans, I would grant the petition for review.

## I.

Prospective Juror No. 16 grew up in Los Angeles and lived in Leimert Park at the time of the trial. Married without children, she had been a registered nurse for more than eight years and had supervised a hospital emergency department. She said she would not be more sympathetic to someone who was injured and would not vote to convict Triplett unless the charges were proven beyond a reasonable doubt. Prospective Juror No. 16 had never served on a jury and had never been the victim of a crime.

During voir dire, the court listened to Prospective Juror No. 16's responses to its oral questionnaire, and the following colloquy ensued:

> "[Prospective Juror No. 16]: I do have contact with law enforcement, both family and friends.
> [¶] . . . [¶]
> "[Court]: The folks you know that work in law enforcement, do you talk to them about their work?
> "[Prospective Juror No. 16]: Sometimes.
> "[Court]: Is there anything about those conversations which makes you think you cannot judge police officer testimony fairly?
> "[Prospective Juror No. 16]: No.

3

"[Court]: Once again, could you follow my instructions to follow a police officer's testimony the same way you would judge anyone else['s] testimony?

"[Prospective Juror No. 16]: I can."

The court continued:

"[Court]: [Question] 10, people you know who work in law enforcement or the court system.

"[Prospective Juror No. 16]: So a relative that works in law enforcement. I have a cousin who is an officer, and a brother.

"[Court]: [Question] 13 is the one about anybody you know who has been charged with a crime.

"[Prospective Juror No. 16]: Brothers.

"[Court]: "Were the crimes your brothers were charged with similar to the charges in this case, or different?

"[Prospective Juror No. 16]: Similar.

"[Court]: Is there anything about their experiences which makes you think you cannot be a fair juror in this type of case?

"[Prospective Juror No. 16]: No.

"[Court]: We are going to ask you to put aside their experiences, listen to the evidence in this particular trial, make your decision of guilty or not guilty based on the evidence in this case. If I were to give that instruction to you, you could follow that?

"[Prospective Juror No. 16]: Yes.

"[Court]: [Question 14,] do you know anybody who has been treated badly by the police or the court?

"[Prospective Juror No. 16]: Yes. Just growing up in L.A.

"[Court]: You are likely to hear some police officer testimony in this case. Anything about those experiences which would make you think you would have a difficult time judging police officer testimony fairly?

"[Prospective Juror No. 16]: No."

Later, the prosecutor entered into the following discussion with Prospective Juror No. 16:

"[Prosecutor]: You mentioned your brothers have been charged with similar crimes. Do you know which crimes?

"[Prospective Juror No. 16]: Similar to [Triplett's]. Murder and assault.

"[Prosecutor]: Did you talk to your brothers about what happened with the cases?

"[Prospective Juror No. 16]: (Nodded.)

"[Prosecutor]: When they talked to you, did you get the feeling they were treated fairly or unfairly?

"[Prospective Juror No. 16]: Fairly.

"[Prosecutor]: Is there anything about those cases you believe would make you unfair in this case?

"[Prospective Juror No. 16]: No."

The prosecutor also probed Prospective Juror No. 16's previous experiences with law enforcement and the legal system:

"[Prosecutor]: You said there was a yes answer on the questionnaire. You said just growing up in L.A.

"[Prospective Juror No. 16]: A Black woman in L.A. with young Black brothers, I have been harassed many times.

"[Prosecutor]: By officers?

"[Prospective Juror No. 16]: Yeah.

"[Prosecutor]: Is there anything about those experiences that makes you feel you might be unfair on this jury?

"[Prospective Juror No. 16]: No. It is the good and the bad. I work with a lot of officers at work. I know a lot of people.

"[Prosecutor]: You have seen both sides of officers?

"[Prospective Juror No. 16]: Yeah.

"[Prosecutor]: How long ago was your cousin murdered?

"[Prospective Juror No. 16]: Five or six years ago.

"[Prosecutor]: Was that investigated by [the Los Angeles Police Department]?

"[Prospective Juror No. 16]: No.

"[Prosecutor]: Is there anything about that investigation that might —

"[Prospective Juror No. 16]: No. It is still going on.

"[Prosecutor]: Are there any frustrations with that that might bleed over into LAPD?

"[Prospective Juror No. 16]: No."

The prosecutor did not challenge Prospective Juror No. 16 for cause, nor did the court excuse her on its own motion. (Code Civ. Proc., § 225, subd. (b).) In other words, the record contains no suggestion that Prospective Juror No. 16 possessed "[i]mplied

bias" or "[a]ctual bias" against either party.  (*Id.*, subd. (b)(1)(B), (C).)

Near the close of jury selection, the prosecutor used his fourth peremptory strike against Prospective Juror No. 16, the last remaining Black juror.  In response to Triplett's *Batson/Wheeler* challenge, the prosecutor offered three reasons for removing her.  He began by asserting that although she "had some relatives that were officers," she "grabbed my attention when she said some of her brothers had been charged with similar crimes.  That alone made me think I may not want her on the jury . . . .  She said she had not talked to her brothers about the court cases or how they turned out.  I think she indicated to us the reason — or she could be fair because she had no idea whether they were treated fairly or not.  [¶] To me, simply the fact that her brothers have been charged with assault with a deadly weapon and attempted murder is one factor in the back of her mind when she listens to how our officers have investigated this case and whether or not the defendant is guilty in our case."

The prosecutor then stated his principal concern:  "What really concerned the People was her answer to the court's question . . . .  There are many people who have grown up in L.A. and may feel like they could be fair, could not be fair, based on their experience.  Perhaps I haven't practiced here long enough. I never heard a juror say as a response[,] 'I can't be fair just growing up in L.A.'  [¶] I understand what she means.  When I asked her, she clarified saying she is a Black female.  She has been harassed.  It sounds like she has seen both the good and bad of society in general.  In addition, her cousin was murdered. Apparently, that investigation is still ongoing.  [¶] She may be a

fair juror. I am not convinced of that mostly because of her answer, 'just growing up in L.A.' She might not be fair."

Finally, the prosecutor observed, "[A]lthough it is a smaller reason, great bodily injury is an issue in our case. I know we do have other nurses. Those nurses do not work in the emergency room. This juror is in a position to see injuries that are more like what we are going to see in our case relative to the other nurse who works in the [intensive care unit] or a nurse who works in surgery, which is less of an emergency situation."

In rejecting Triplett's motion, the trial court said: "As to [Prospective Juror No.] 16, as the People pointed out, just living in Los Angeles, she would have bias against police officer testimony. She also indicated she had brothers charged with a similar crime and a cousin who was murdered. In my view, those are also very valid race neutral reasons."

The Court of Appeal affirmed, concluding that the prosecutor's strike against Prospective Juror No. 16 was race-neutral because the record showed "she had 'brothers' who had been charged with crimes similar to the charged crimes in this case. She further stated that she knows people who have been treated badly by the police or courts, and that she has been harassed many times as a Black woman with two young Black brothers. The prosecutor can reasonably infer that a juror with such experiences may be biased against police officers who testify for the prosecution."

## II.

The prosecutor's explanations for striking Prospective Juror No. 16 are problematic for several reasons. As I explain, the record shows that the prosecutor repeatedly mischaracterized the juror's voir dire answers. The discrepancies suggest that the prosecutor had in mind a certain

narrative about Prospective Juror No. 16 as a Black woman growing up in Los Angeles. Instead of paying attention to what Prospective Juror No. 16 actually said, the prosecutor — whether consciously or not — appeared to mold her answers to fit that narrative.

The prosecutor's principal reason for striking Prospective Juror No. 16 — "[w]hat really concerned the People" — was her response to the question: "Do you know anybody who has been treated badly by the police or the courts?" She replied, "[As a] Black woman in L.A. with young Black brothers. I have been harassed many times" by officers. She then confirmed that despite this harassment, she would be a fair juror because she has witnessed "the good and the bad" of law enforcement by collaborating with police officers through her work as a nurse and having a brother and cousin who are police officers.

When the prosecutor stated the main reason for his peremptory strike, however, he misrepresented her response. The prosecutor told the court that Prospective Juror No. 16 said she " 'can't be fair just growing up in L.A.' " He continued, "I understand what she means. When I asked her, she clarified saying she is a Black female. She has been harassed. . . . I am not convinced of that mostly because of her answer, 'just growing up in L.A.,' she might not be fair." But Prospective Juror No. 16 said no such thing. Her remark — "just growing up in L.A." — was simply a response to the question whether she knew anyone who has been treated badly by the police or courts. At no point did she say she " 'can't be fair' " because of her experiences; in fact, she repeatedly said the opposite. The trial court took the prosecutor's characterization of Prospective Juror No. 16's answer at face value, without checking the record to review

what she actually said.  The trial court's ruling in this regard should not be accorded deference.

The prosecutor's other stated reasons for striking Prospective Juror No. 16 are also unavailing.  While acknowledging that she had a brother and a cousin serving as police officers, the prosecutor's first reason for striking her was that she had brothers who had been charged with similar crimes.  He then claimed that Prospective Juror No. 16 "said she had not talked to her brothers about the court cases or how they turned out.  I think she indicated to us the reason — or she could be fair because she had no idea whether they were treated fairly or not."

But the prosecutor's characterization is again belied by the record.  The exchange actually proceeded as follows:

> "[Prosecutor]:  Did you talk to your brothers about what happened with the cases?
> "[Prospective Juror No. 16]:  (Nodded.)
> "[Prosecutor]:  When they talked to you, did you get the feeling they were treated fairly or unfairly?
> "[Prospective Juror No. 16]:  Fairly.
> "[Prosecutor]:  Is there anything about those cases you believe would make you unfair in this case?
> "[Prospective Juror No. 16]:  No."

As the record shows, the prosecutor was incorrect in stating that Prospective Juror No. 16 "said she had not talked to her brothers about the court cases or how they turned out," and not once did Prospective Juror No. 16 say "she had no idea whether [her brothers] were treated fairly or not."  Instead, Prospective Juror No. 16 said she was familiar with her brothers' cases, and she

confirmed that they had been treated "[f]airly" by the system and that their cases would not affect her impartial evaluation of Triplett's case. She again underscored that her interactions with the police included both "the good and the bad" because she regularly engages with officers through her work and has relatives in law enforcement. Yet the trial court accepted this reason as race-neutral, again without checking the record or noticing these discrepancies. The trial court's ruling in this regard is likewise not entitled to deference.

The prosecutor's third reason for striking Prospective Juror No. 16 was her job as an emergency room nurse. The prosecutor said this was "a smaller reason," and the trial court did not rely on it in its ruling. The prosecutor acknowledged that he did not strike two non-Black jurors who were nurses but sought to distinguish Prospective Juror No. 16 by noting that the injuries she would see in Triplett's case would be similar to the ones she sees specifically as an emergency room nurse.

But it is not clear that the other two nurses, who worked in an intensive care unit and a surgery unit, respectively, are so easily distinguished, and the prosecutor did not ask either Prospective Juror No. 16 or the other two nurses about the type of injuries they see in their jobs. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 246 ["[T]he prosecution asked nothing further about the [purported reason], as it probably would have done if the [reason] had actually mattered."]; *id.* at p. 250, fn. 8 ["the failure to ask undermines the persuasiveness of the claimed concern"]; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1170 [lack of inquiry by the prosecutor "raises a question as to how interested he was in meaningfully examining" the issue proffered as a reason for a contested strike].) Further diminishing the prosecutor's credibility is the fact that he did

11

not attempt to strike Prospective Juror No. 13, a nurse whose father had been convicted of assaulting a police officer. (See *Miller-El,* at p. 241 ["If a prosecutor's proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."].)

The final reason stated by the prosecutor and cited by the trial court was that Prospective Juror No. 16 had a cousin who was murdered. But when questioned about this, Prospective Juror No. 16 said that the investigation was ongoing and that she had no "frustrations with [the investigation] that might bleed over into LAPD." In any event, this one reason does not substantially negate the considerable suspicion arising from the mischaracterizations underlying the prosecutor's other stated reasons.

## III.

Apart from the concerns above, the prosecutor's primary reason for striking Prospective Juror No. 16 raises a deeper issue worthy of our review: Is it truly race-neutral to strike a Black juror for saying that because of "[j]ust growing up in L.A.," she knew people who had been treated badly by the police or the courts, and that as "[a] Black woman in L.A. with young Black brothers," she had experienced harassment by police? The fact that these everyday experiences of Black Americans are considered legitimate grounds for a peremptory strike — even when a juror unequivocally says she will be fair and follow the law, and even when there is no basis to remove the juror for cause — goes a long way to explaining why *Batson* "has been roundly criticized as ineffectual in addressing the discriminatory use of peremptory challenges during jury

selection." (*State v. Holmes* (Conn. 2019) 221 A.3d 407, 411.) It may also help explain why a substantial majority of Americans believe the criminal justice system treats Blacks less fairly than whites. (Horowitz et al., Pew Research Center, Race in America 2019 (Apr. 9, 2019) pp. 11, 46 [84% of Black respondents, 63% of white respondents, and 67% of all respondents in a survey of 6,637 U.S. adults expressed that belief].)

No great sociological inquiry is needed to understand the problematic nature of the strike at issue here. Countless studies show that Black Americans are disproportionately subject to police and court intervention, even when they are no more likely than whites to commit offenses warranting such coercive action. For example, studies show that Black and white Americans use and sell illegal drugs at nearly identical rates. (See, e.g., U.S. Dept. of Health & Human Services, Results from the 2011 National Survey on Drug Use and Health: Summary of National Findings (Sept. 2012) pp. 23–24; Rosenberg et al., *Comparing Black and White Drug Offenders: Implications for Racial Disparities in Criminal Justice and Reentry Policy and Programming* (2016) 47 J. Drug Issues 132, 136.) But "[i]n some states, black men have been admitted to prison on drug charges at rates twenty to fifty times greater than those of white men." (Alexander, The New Jim Crow: Mass Incarceration in the Age of Colorblindness (2010) p. 7; see *id.* at pp. 5–7 [tracing the historical roots of the disproportionate incarceration of Black Americans to slavery and Jim Crow].)

A 2019 study found that Black drivers in Los Angeles are substantially more likely to be pulled over, searched, and detained or handcuffed by the police than white drivers, even though "whites are more likely to be found with illegal items." (Poston & Chang, *LAPD searches blacks and Latinos more. But*

*they're less likely to have contraband than whites*, L.A. Times (Oct. 8, 2019).) "Of the more than 385,000 drivers and passengers pulled over by the LAPD . . . 27% were black, in a city that is about 9% black." (*Ibid.*) "24% of black drivers and passengers were searched, compared with 16% of Latinos and 5% of whites . . . . [¶] That means a black person in a vehicle was more than four times as likely to be searched by police as a white person, and a Latino was three times as likely." (*Ibid.*) "Blacks and Latinos were more than three times as likely as whites to be removed from the vehicle and twice as likely to either be handcuffed or detained at the curb." (*Ibid.*)

In *People v. Buza* (2018) 4 Cal.5th 658, I observed that the state's retention of DNA collected from felony arrestees "predictably burdens certain groups. African-Americans, who are 6.5 percent of California's population, made up 20.3 percent of adult felony arrestees in 2016. [Citations.] Yet they comprised 24.3 percent of felony arrestees who were released by law enforcement or the prosecuting attorney in 2016 before any court disposition. [Citation.] Non-Hispanic Whites, by contrast, comprised 31.2 percent of felony arrestees but only 27.0 percent of felony arrestees released by law enforcement or the prosecuting attorney. [Citations.] The fact that felony arrests of African-Americans disproportionately result in no charges or dropped charges means that African-Americans are disproportionately represented among the thousands of DNA profiles that the state has no legal basis for retaining." (*Id.* at p. 698 (dis. opn. of Liu, J.).)

At the same time, Black Americans are often inadequately protected by the police, which also contributes to their negative perceptions of law enforcement and the justice system. This underprotection takes various forms, including "unsolved

14

homicides, permitted open-air drug markets, slow or nonexistent 911 responses, and the tolerance of pervasive, low levels of violence, property crimes, and public disorder." (Natapoff, *Underenforcement* (2006) 75 Fordham L.Rev. 1715, 1723; see Brunson, *Protests focus on over-policing. But under-policing is also deadly.*, Washington Post (June 12, 2020); Kennedy, Race, Crime, and the Law (1997) pp. 29–75.) Between 2008 and 2018, "police in 52 of the nation's largest cities . . . failed to make an arrest in nearly 26,000 killings . . . . In more than 18,600 of those cases, the victim . . . was black. [¶] Black victims, who accounted for the majority of homicides, were the least likely of any racial group to have their killings result in an arrest . . . . While police arrested someone in 63 percent of the killings of white victims, they did so in just 47 percent of those with black victims." (Lowery et al., *Murder with Impunity: An Unequal Justice*, Washington Post (July 25, 2018).) No wonder Black Americans in highly policed communities "characterize police as contradictory — everywhere when surveilling people's everyday activity and nowhere if called upon to respond to serious harm." (Prowse et al., *The State from Below: Distorted Responsiveness in Policed Communities* (2019) 56 Urban Affairs Rev. 1423, 1423.)

Racial disparities in policing also affect children attending public schools. (See *In re A.N.* (2020) 9 Cal.5th 343, 365, 367–369 (conc. opn. of Liu, J.) [discussing the "school-to-prison pipeline" in the context of truancy].) According to the National Juvenile Justice Network, "Black and Latino students [in Los Angeles] are 6 times to 29 times more likely than white students to be ticketed for the same exact behavior." (Community Rights Campaign, Black, Brown, and Over-Policed in L.A. Schools (Oct. 2013) p. 6.) Other studies have shown that Black students are

disproportionately punished for low-level offenses based on subjective judgment, such as "disrespect" of authorities, whereas white students "were significantly more likely than [B]lack students to be referred" for more serious and objective offenses like "smoking, leaving without permission, vandalism, and obscene language." (Skiba et al., *The Color of Discipline: Sources of Racial and Gender Disproportionality in School Punishment* (2002) 34 Urban Rev. 317, 332, italics omitted.)

Predominantly Black schools are the settings where school resource officers are "most likely . . . to use extreme punitive discipline" that "ignore[s] white rule-breakers, but make[s] an example of African American rule-breakers." (Irwin et al., *The Race to Punish in American Schools: Class and Race Predictors of Punitive School-Crime Control* (2013) 21 Critical Criminology 47, 50.) In light of such disparate treatment by school authorities, minority students are "more likely to hold less positive attitudes toward the police" — a perception that "form[s] quite early in life for many minority youth." (Hurst & Frank, *How kids view cops: The nature of juvenile attitudes toward the police* (2000) 28 J. Crim. Just. 189, 200.)

Such experiences and perceptions continue into adulthood. In a 2020 Kaiser Family Foundation poll, 21 percent of Black adults, compared to 3 percent of whites, reported being a victim of police violence, and 30 percent of Black adults, compared to 3 percent of whites, reported unfair treatment in their interactions with police. (Hamel et al., KFF Health Tracking Poll - June 2020 <https://www.kff.org/dc19429/> [as of Aug. 31, 2020].) In a 2017 survey of 3,453 United States adults by the Harvard School of Public Health, 60 percent of Black respondents, compared to 6 percent of whites, said they or a family member had been unfairly stopped or treated by the

police because of their race, and 45 percent of Black respondents, compared to 7 percent of whites, said they or a family member had been treated unfairly by the courts because of their race.  (Harvard School of Public Health, Discrimination in America: Experiences and Views of African Americans (Oct. 2017) pp. 1, 8; Harvard School of Public Health, Discrimination in America: Experiences and Views of White Americans (Nov. 2017) p. 11.)  According to another recent poll, whereas 42 percent of white adults in America have "a great deal" of confidence that police officers treat Black and white people equally, 48 percent of Black adults have "very little" or "no confidence" at all.  (Santhanam, Two-thirds of Black Americans don't trust the police to treat them equally. Most white Americans do, PBS NewsHour (June 5, 2020).)

Against this backdrop, this court has repeatedly upheld peremptory strikes of jurors based on their experiences or perceptions of law enforcement or the courts, even though this disproportionately burdens Black jurors.  (See, e.g., *People v. Winbush* (2017) 2 Cal.5th 402, 436–437 ["negative attitude toward law enforcement" or "negative experience with law enforcement" is "a valid basis for exclusion"]; *id.* at p. 439 ["distrust of the criminal justice system is a race-neutral basis for excusal"]; *ibid.* ["Skepticism about the fairness of the criminal justice system to indigents and racial minorities has also been recognized as a valid race-neutral ground for excusing a juror."]; *People v. Melendez* (2016) 2 Cal.5th 1, 18 [Black juror's "distrust of police" and "belie[f that] the criminal justice system had treated [his] brother-in-law unfairly" were race-neutral reasons for excusal]; *People v. Booker* (2011) 51 Cal.4th 141, 167, fn. 13 ["A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge."]; *People v.*

*Lenix* (2008) 44 Cal.4th 602, 628 [" 'We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement.' "].) We recently affirmed the death sentence of a Black defendant convicted by a jury with no Black jurors, upholding the prosecutor's use of "peremptory strikes based on [Black] jurors' attitudes toward the O.J. Simpson case," one of the most "racially polarizing" cases in modern times. (*People v. Miles* (2020) 9 Cal.5th 513, 613 (dis. opn. of Liu, J.).)

Nearly three decades ago, in an incident caught on videotape and seen around the world, Rodney King, an unarmed Black man stopped by Los Angeles police after a high-speed chase, was brutally kicked and beaten by four officers while more than a dozen other officers stood by. King suffered "skull fractures, broken bones and teeth, and permanent brain damage" as a result of the beating. (Sastry & Bates, *When LA Erupted in Anger: A Look Back at the Rodney King Riots* (Apr. 26, 2017) NPR.) The four officers were criminally charged with assault and use of excessive force, but a jury that included no African Americans did not return a single guilty verdict.

Not long afterward, during jury selection in the capital trial of a Black defendant, a Black prospective juror "expressed the view that the criminal justice system sometimes treats citizens unfairly because of race, offering an example: 'The first Rodney King trial where the officers were acquitted seemed to be a blatant miscarriage of justice, because the victim . . . was black.' She wrote that 'Blacks, poor people, minorit[ies and] women seem to get harsher treatment than whites, rich people. I've known many studies & research to show this as fact.' On the other hand, she appeared to favor use of the death penalty and consistently acknowledged a juror's duty to consider the

evidence fairly and to follow the law as directed by the court." (*People v. Cornwell* (2005) 37 Cal.4th 50, 67–68.) The trial court asked the juror, " 'What do you mean by the injustice that you perceive [in the Rodney King case]?' " (*Id.* at p. 68.) The juror responded: " 'Well, it seemed that even with the major evidence, that having it on videotape there was still some lack of believing that police could treat a black man like that. And then when the trial took place, the first trial they were acquitted, even though almost the whole world saw it happening. And coming from Los Angeles and having had relatives treated like that myself it just — it makes it very very hard to keep trusting.' " (*Ibid.*) This court upheld the prosecutor's strike of this juror, noting that "despite her obvious intelligence and good faith, . . . her express distrust of the criminal justice system and its treatment of African-American defendants" was a race-neutral reason "for *any* prosecutor to challenge her." (*Id.* at p. 70.)

As it stands, our case law rewards parties who excuse minority jurors based on ostensibly race-neutral justifications that mirror the racial fault lines in society. This approach is not dictated by high court precedent, and it is untenable if our justice system is to garner the trust of all groups in our communities and to provide equal justice under law. "[D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent . . . ." (*Hernandez v. New York* (1991) 500 U.S. 352, 362 (plur. opn. of Kennedy, J.); see *id.* at p. 379 (dis. opn. of Stevens, J.) ["An explanation that is 'race neutral' on its face is nonetheless unacceptable if it is merely a proxy for a discriminatory practice."]; *id.* at p. 375 (dis. opn. of Blackmun, J.).) "If any explanation, no matter how insubstantial and no matter how great its disparate impact, could rebut a[n]

inference of discrimination provided only that the explanation itself was not facially discriminatory, 'the Equal Protection Clause "would be but a vain and illusory requirement." ' " (*Id.* at p. 377 (dis. opn. of Stevens, J.).)

In this case, Prospective Juror No. 16 considered it self-evident that she knew people who had been treated badly by the police or the courts "[j]ust growing up in L.A." and that she has experienced harassment by police as "[a] Black woman in L.A. with young Black brothers." The mistreatment of Black Americans by law enforcement is itself a serious and longstanding problem. Current law then compounds and institutionalizes this problem by permitting the exclusion of Black jurors based on the very mistreatment that they, their friends or family, or members of their community have experienced. And in turn, the conviction of Black defendants by juries from which all Black prospective jurors have been struck further reinforces perceptions of unfairness. In light of this vicious cycle, is it any wonder that so many Black Americans — indeed, so many Americans of all races — have doubts about the fairness of the justice system when it comes to the treatment of our Black citizens?

"Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process." (*Flowers v. Mississippi* (2019) 588 U.S. __, __ [139 S.Ct. 2228, 2238].) To many people, excluding qualified Black jurors based on their negative experiences with law enforcement or the justice system must seem like adding insult to injury. It has been more than 30 years since this court has found racial discrimination in the peremptory strike of a Black juror. (See *People v. Snow* (1987) 44 Cal.3d 216.) Over the decades, California courts have repeatedly upheld the

exclusion of Black jurors for reasons like those at issue here. It is time to reassess whether the law should permit the real-life experiences of our Black citizens to be devalued in this way. At stake is nothing less than "public confidence in the fairness of our system of justice." (*Batson, supra,* 476 U.S. at p. 87.) I would grant the petition for review.

**LIU, J.**

**I Concur:**

**CUÉLLAR, J.**